REDMANN, Chief Judge.
Convicted after jury trial of, and sentenced to four-year concurrent sentences for, two charges of possession of stolen property (a TV camera and a video recorder), defendant by this appeal argues only that his pre-trial motion to suppress both the physical evidence and his statements should have been granted.
Defendant and another person were shot by other persons inside defendant’s house on the night of October 8, 1983. When the police arrived they found the second victim in the living room and defendant on the floor in an adjoining bedroom. Investigation supervisor Sergeant Emmett Dupas testified:
“Mr. Winslow was the only one that seemed to be coherent. I was asking him what had happened and who had shot him. He was, at the time, you know, complaining about the pain he was in, and I ceased talking to him for a moment and looked around the room for evidence. All the furniture had been turned over, the sofa in the front room was turned over, the plants, and a lot of drawers had been pulled out. I started to look around the room. At that time, Mr. Winslow told me to get out of his house, that he didn’t want the police in there, to quit looking, and I told him I couldn’t at the time because of the fact, you know, the shooting had occurred in there. And when I looked underneath the bed, right where he was lying, there was a color video camera, and several video recorders in the room, and I felt that if it was a brand new camera, why would it be shoved under the bed with no case or anything in it — [By the court] Q. How did you happen to look under the bed? What brought you to look under the bed? A. He was lying on the floor, right at the end of the bed. The bed had been moved, the mattress was moved to the side, and somebody had looked underneath the mattress, and clothes were pulled out the closet and drawers were pulled out, so I did locate several 9 mm shells on the floor, under the bed, next to the wall, and plus, two pellets that had gone through the defendant and the subject in the front room, we located those on the floor also_ There was numerous video equipment, the way I recall it_ [By the prosecution] Q. Did you have occasion to read rights to this defendant at any time? A. I was getting *409 to that. What happened, I told Officer Macklen, when the defendant started telling us to get out the residence — in fact, we had to hold him down so he could be treated. We had to hold him down so the medic could treat him and transport him to Charity Hospital, and when he became so uncooperative, I told Officer Macklen to confiscate the property and bring it to the property room, and they conducted [sic; “for them to conduct”?] an investigation as to where it came from. At that time, Mr. Winslow made a statement to me, he said, ‘Look, everything ain’t stolen.’ He said, ‘That camera,’ the camera I pulled from under the bed, ‘I got the camera from a dude in the St. Thomas [public housing] project.’ At that time we gave him his rights, and then he shut up about the equipment after I gave him his rights, the video equipment, and then he continued to insist that we get out of his residence.... Q. Was the statement about the video equipment being stolen made in response to any questions that you were asking him at that time, or was that voluntary? A. Okay, I don’t remember his exact words. When I told Officer Macklen to take all the equipment, bring it to the property room, and they were going to investigate, you know, if it was possibly stolen, that’s when Mr. Winslow made the statement to the effect that the only thing that could be stolen would be the camera, because he bought that from a guy out of the St. Thomas project, and that might be stolen. That’s when I gave him his rights and then he shut up. Q. You did not ask him specifically any questions regarding the stolen video equipment at that time, is that correct? A. After I gave him his rights, I asked him a couple of questions. Q. Before you gave him his rights? A. I wasn’t talking to him. I was talking to Officer Macklen, and he was lying on the floor, and he interjected into the conversation that the only thing that could be stolen would be the camera. Q. What made you suspicious of this video equipment inside this house? A. First of all, the quantity of it. He had two or three recorders, and the fact that it was a brand new camera shoved underneath the bed, with no case on it. Normally a piece of equipment like that would be kept in a case to keep it from getting busted_ I already had a detective coming over to investigate the shooting, to conduct a follow-up. I said, ‘While you’re at it, check out the video equipment,’ and he took down all the serial numbers. Officer Murray determined that two pieces of the equipment were stolen and arrested Mr. Winslow two days later at Charity Hospital when he was discharged.”
Defendant’s testimony contradicts that testimony by Sgt. Dupas. Defendant says the camera was wrapped up in a quilt inside a two-drawer chest in his bedroom. Defendant also denies having made the statement attributed to him, and argues that it should in any case have been suppressed because prior to the instructions required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We disagree.
The trial judge evidently accepted Sgt. Dupas’s testimony and rejected defendant’s. That testimony, construed in the light most favorable to the prosecution as required by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), shows that defendant was not under arrest or any functional equivalent at the time of his statement. He was a victim rather than a suspect in the crime under investigation, namely the shooting. Thus the officers were under no obligation, at that point, to give Miranda warnings to defendant. Nor was defendant’s statement made in response to any questioning or its equivalent, but rather in response to Du-pas’s reaction to seeing in plain view the unusual quantity of video equipment and to his instruction to a subordinate (also on the scene investigating the shooting) “to confiscate the property and bring it to the property room [to conduct] an investigation as to where it came from.”
*410 The shooting investigation — unchallenged as to its own legitimacy — lawfully produced, Michigan v. Tyler, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), plain-view evidence (the unusually large quantity of video equipment) conceivably related to the shooting but also suggestive of theft or possession of stolen property. We recognize that, at that point, by hindsight, defendant became a suspect in an apparent theft or an apparent possession of stolen property. We are also aware that (according to Sgt. Dupas’s testimony) defendant had just asserted his right to privacy by ordering the police “to get out of his house, that he didn’t want the police in there, to quit looking.” Except for the investigation of the shooting, certainly the police officers had no authority to remain in defendant’s house, and we would be obliged to suppress defendant’s statement and any other evidence then obtained as a consequence of that statement. But the necessity of obtaining treatment for defendant’s gunshot wounds and the reasonableness of investigating the shooting dictated to the police officers that they could not simply leave the house as defendant ordered. We find no error in the trial court’s refusal to suppress this statement and the TV camera seized at that time.
Defendant also sought to suppress a statement Officers Murray and Gordon testified was made two days later at the hospital, when they went there to interview defendant regarding the shooting but also to tell him that a check of the serial numbers of the TV camera and of a videocassette recorder left in defendant’s house showed those items to have been stolen. The officers testified that they interviewed defendant regarding the shooting, then informed him again of his Miranda rights, then asked him if he knew that the TV camera and the recorder were stolen, and he responded that, having bought them in a public housing project, he “figured” they were.
Defendant, his sister, his girlfriend, and another woman all contradict the officers’ testimony. But, once again, the determination of which witness or witnesses to believe is the trial court’s and not the appellate court’s function, and we must accept the evidence from the trial court in the light most favorable to the prosecution, in accord with Jackson v. Virginia, supra. We therefore find no error in the refusal to suppress the statement defendant made in the hospital.
Nor do we find error in the refusal to suppress the recorder that the officers retrieved from defendant’s home after speaking to him at the hospital. Officer Murray testified at the suppression hearing that, while they were at the hospital, defendant “told one of his family members to allow us entrance into the house to get the [recorder].” Murray testified at trial that one of the persons who had been at the hospital, “either a girlfriend or sister, met us at the house, and they had keys to the house, and they allowed us in just to confiscate the video recorder_ Q. Did you speak to her about going to the house when you were at the hospital? A. Yes, ma’am, she agreed to meet us at the house.” Again, defendant and his witnesses testify to the contrary, but the trial court believed the police officers and it is the trial court’s function to evaluate the credibility of witnesses. A search conducted pursuant to a valid consent is constitutionally permissible, though the prosecution bears the burden of proving that consent was voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Here there is no suggestion that the consent was the result of threats or imposition, or of any significant disadvantage of defendant. (Though he was in the hospital from his gunshot wound to the leg, he was ambulatory and was about to be discharged.) Defendant’s only contention is that his consent was not given and that contention is necessarily governed by the Jackson rule of interpreting the evidence in the light most favorable to the prosecution.
The conviction is therefore affirmed.