# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 20-162


**STATE OF LOUISIANA**

**VERSUS**

**CHRISTOPHER JEROD MOORE**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 3746-18
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## D. KENT SAVOIE
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of, Sylvia R. Cooks, John E. Conery, and D. Kent Savoie, Judges.


**AFFIRMED.**

**John Foster DeRosier**
**14th JDC District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Christopher Jerod Moore**

**Elizabeth Brooks Hollins**
**Asst. DA**
**901 Lakeshore Drive Ste 800**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**Savoie, Judge.**

On February 14, 2018, Defendant, Christopher Jerod Moore, was charged by bill of information with the January 28, 2018 attempted second degree murder of Ms. Cloee Jackson ("Ms. Jackson"), in violation of La.R.S. 14:27 and 14:30.1. On October 5, 2018, Defendant filed a "Motion to Appoint Sanity Commission," requesting the commission to "determine both his competency to stand trial and his mental condition at the time of the offense." The motion was granted the same day, and the trial court appointed Drs. James Anderson and Patrick Hayes to serve on the commission.

On November 5, 2018, Defendant filed a "Motion and Order to Dismiss Motion to Appoint Sanity Commission," noting the request that the commission evaluate Defendant's mental condition at the time of the offense was prematurely filed. The trial court granted the motion the same day and dismissed the sanity commission. Also on November 5, 2018, Defendant filed a new "Motion to Appoint Sanity Commission," this time requesting only that Defendant's ability to assist in his own defense be evaluated. The same day, the trial court granted the motion and appointed a new commission composed of Drs. James Anderson and Andrew Thrasher.

A hearing was held regarding the sanity commission on February 6, 2019. Both Dr. Thrasher and Dr. Anderson testified Defendant was competent to stand trial. Dr. Thrasher noted Defendant was taking Zyprexa, an antipsychotic drug, as well as Remeron, a drug used for various mood issues and possibly for sleep issues. Dr. Anderson noted Zyprexa was used to treat "schizophrenia spectrum type disorders and possibly bipolar disorder," and that Remeron is an antidepressant. Dr. Anderson noted Defendant claimed to have had a number of psychiatric

hospitalizations going back to his pre-teen years, claimed to have been admitted approximately five times over the preceding five years, and that his most recent hospitalization was in January of 2018. Dr. Anderson opined that the symptoms Defendant described (paranoia, difficulty sleeping, anxiety) could be the results of "a schizophrenia spectrum disorder or a substance use disorder." Dr. Anderson could not say, without a more thorough examination, whether Defendant's problems were originally caused by schizophrenia or substance abuse. Defendant was then found competent to proceed to trial.

On June 5, 2019, Defendant filed a "Notice of Defense of Voluntary Intoxication." On June 7, 2019, the State filed an objection based upon Defendant's notice not being timely, noting that Defendant was scheduled for trial on June 10, 2019, and that La.Code Crim.P. art. 726 required Defendant's notice be filed in writing no later than ten days prior to trial. The trial court ultimately denied the voluntary intoxication defense unless something "really unexpected" came out at trial.

Following jury selection on June 10, 2019, Defendant's trial began on June 11, 2019. On June 13, 2019, a unanimous jury found Defendant guilty of attempted second degree murder. On September 6, 2019, Defendant filed a motion for new trial under La.Code Crim.P. art. 851, contending the verdict was contrary to the law and evidence, the trial court's rulings showed prejudicial error, and the ends of justice would be served in granting a new trial. The court heard the motion that day, denied the motion in open court, and sentenced Defendant to fifty years imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence.

2

On October 2, 2019, Defendant filed a "Motion to Reconsider Sentence," arguing his maximum sentence was excessive because "[p]rior to this conviction, Mover had never been convicted of any violent offense." The motion was denied without hearing or reasons the same day.

Defendant now timely appeals his conviction and sentence, contending there was insufficient evidence to support his conviction, that his fifty-year sentence is excessive, that the trial court erroneously refused to consider mitigating circumstances in fashioning the sentence, and that trial counsel was ineffective for failing to argue the trial court failed to comply with La.Code Crim.P. art. 894.1.

## FACTS

The State's first witness was Corporal Wilbert Ponthieux, a thirteen-year veteran of the Lake Charles Police Department. Corporal Ponthieux testified that around 3:00 p.m. on January 28, 2018, he, along with an officer that he was training, were dispatched to the intersection of Goos Street and Mill Street in Lake Charles, Louisiana, in regard to a child being stabbed. However, upon arrival, they learned it was not a child, but rather an adult, who had been stabbed. Subsequently, they learned that someone had driven a black SUV to the Acadian Ambulance substation on Opelousas Street. Corporal Ponthieux stated his involvement in the case ended with securing the crime scene and coordinating responding officers.

The State then called Ms. Berita Durgan. Ms. Durgan testified that while driving home from church with an infant in the back seat of her vehicle, she stopped at the intersection of Goos and Mill Streets. She indicated that while she was at the stop sign, she observed "a guy and a girl standing in the street" "for a short time" before the man began stabbing the girl, who was later identified as Ms. Jackson. Ms.

3

Durgan also testified that she could see the man's face when he turned to look at her, and she identified Defendant at trial as the man she saw stabbing Ms. Jackson.

Ms. Durgan also indicated at trial that she could see a knife in Defendant's hand while he was stabbing Ms. Jackson, and she further noted that she never saw Ms. Jackson attack Defendant. She also stated that she had never seen Ms. Jackson before the incident at issue.

Also, according to Ms. Durgan, after seeing Defendant stabbing Ms. Jackson, she rolled down her window, held down her car horn, and screamed at Defendant to stop stabbing Ms. Jackson. The distraction gave Ms. Jackson a chance to run, but Defendant began chasing her again. Ms. Duran saw Ms. Jackson fall and then saw Defendant get on top of her and start stabbing her again. Ms. Durgan testified that, at that point, she then drove her vehicle onto the grass while still blowing her car horn and screaming at Defendant to stop stabbing Ms. Jackson. Ms. Durgan stated that Defendant then returned to the truck in which he and Ms. Jackson had previously been, while Ms. Jackson ran to the vehicle in front of Ms. Durgan, and then to Ms. Durgan's vehicle, at which time Ms. Durgan unlocked her doors.

Ms. Durgan stated that as Ms. Jackson got into her vehicle, she asked Ms. Durgan to call her mother, while three of Ms. Jackson's daughters jumped into the vehicle with her. Ms. Durgan then drove Ms. Jackson and her three daughters to Lake Charles Memorial Hospital. Ms. Durgan indicted at trial that she did not recall Ms. Jackson saying anything else to her other than asking Ms. Durgan to call her mother.

Ms. Durgan also testified that the knife Defendant used ultimately ended up inside of her vehicle, and she described it as a black-handled knife. She further

4

indicated that she had begun trying to clean some of Ms. Jackson's blood off the seat in her vehicle with peroxide before an officer arrived and told her to stop.

The State's next witness was Mr. Kevin Porter. Mr. Porter testified that he lived next to the field into which Ms. Jackson had initially fled. He stated that on the day of the incident, he was inside his house and heard screaming. He then looked out of his window and thought the screaming was coming from kids playing in the field. However, he then heard another scream, looked again, and saw "this woman run, she fell, and the guy got over her. I didn't see no knife. I just seen him . . . making a stabbing motion." He testified that he then heard one of the kids say that the man was stabbing the woman and so he ran outside.

Mr. Porter further testified that when he went outside, he saw a "guy", who he identified by name at trial as Defendant, "standing up looking at his arm." Mr. Porter noted he had seen Defendant prior to the incident. Mr. Porter testified that Defendant then requested his help using a belt to stop the bleeding in his arm, and Mr. Porter acknowledged assisting Defendant with tying the belt around his arm. Mr. Porter stated that when he saw Defendant, he could see that he was bleeding, but he could not tell where the wound was. Mr. Porter further noted that Defendant was calm at the time and that he thought Defendant was maybe "on something."

Mr. Porter also testified that as he got to the scene, the woman was gone, and that "[s]omebody had picked her up and was taking her to the hospital." He indicated that he had never seen the woman before the incident. He further testified that as the woman passed by him in the vehicle, she asked him to get her children that were still in her truck. According to Mr. Porter, he then told Defendant that the woman wanted her children and that Defendant told him to "Go ahead and get them." Mr. Porter then got the children, and Defendant got back into the vehicle and drove away.

Mr. Porter stated that he then brought the children to his mother's house, where they waited for the police to arrive.

The State then called the victim, Ms. Jackson, to testify at trial. Ms. Jackson identified Defendant, testified that she and Defendant had had an on-and-off relationship for two or three years, and noted that Defendant was the father of one of her six children. According to Ms. Jackson, Defendant had been staying with her at her house for "a couple of days" prior to the January 28, 2018 incident, and during January 2018, he would stay at her house for sometimes one week, two weeks, or three weeks at a time. She explained that she would pick Defendant up from his family in Goosport and bring him to her house.

Ms. Jackson testified that during the morning of January 28, 2018, she had made plans to go out to eat to eat later in the day at a Ryan's Steakhouse with her mother, sister, her sister's children, her six children, and Defendant. Ms. Jackson explained that after her mother returned home from church, she, along with Defendant and her children, drove to her mother's house prior to going out to eat. According to Ms. Jackson, prior to them leaving her mother's house to go eat, Defendant indicated that he no longer wanted to go. Ms. Jackson then told Defendant "I ain't got time for this," and that she would bring Defendant to his mother's house. However, Defendant indicated to her he wanted Ms. Jackson to bring him to his friend Jayda's house, which was near where Ms. Jackson lived.

According to Ms. Jackson, at one point, she pulled over at Huber Park because she was mad at Defendant for not wanting to go out to eat with her family, and she told him to get out of her car. Ultimately, he did not, and they continued driving towards Jayda's house.

Ms. Jackson explained that once they arrived at the parking lot by Jayda's house, Defendant got out of her truck and began talking to some "guys" that were in the parking lot; however, Defendant never went to Jayda's house. Meanwhile, Ms. Jackson and her children remained in her truck for about thirty minutes. According to Ms. Jackson, Defendant then walked back toward the driver's side of her truck, she rolled down the window, and she told Defendant to hurry up because she was ready to go out to eat. She further told Defendant that she was going to bring Defendant to his mother's house in Goosport since he did not want to go out to eat with her family. Ms. Jackson indicated that she then gave Defendant the keys to her house, Defendant went inside, and then came out with a little white bag that had some of his clothes in it. Defendant then got back into Ms. Jackson's truck, they left, and proceeded toward Defendant's mother's house.

Then, according to Ms. Jackson, while they were stopped at a stop sign at the intersection of Mill and Goos, Defendant grabbed Ms. Jackson's keys out of her truck's ignition, got out of the truck, went on her side, and demanded that she get out. Ms. Jackson refused and locked the door; however, Defendant was able to unlock it since he had the keys. According to Ms. Jackson, Defendant then pulled her out of the truck, took a knife out of his bag, and "[h]e just started stabbing me in front of my kids, . . . I ran, like I was just running for my life. And when I ran, I ran into a field [that] was full of grass, and he was stabbing me." She further testified that she "ran into this area, and then I fell, and that's when -- he stabbed me multiple times again." She stated that she then got up and "ran into some guy's vehicle." However, the occupants of the vehicle told her they could not help her, so she got out. Ms. Jackson stated that at that time she was losing a lot of blood and felt weak;

7

however, ultimately, she was able to get up and run to Ms. Durgan's vehicle. Ms. Jackson testified that she did not know Ms. Durgan prior to this incident.

According to Ms. Jackson, her nine year old, seven year old, and six year old children had gotten out of her truck and into Ms. Durgan's vehicle, but her four year old, two year old, and one year old children stayed in Ms. Jackson's truck. Ms. Jackson further testified, "I was holding my neck, 'cause blood was just gushing out of my neck. Blood was all over my face." She also stated that her children were screaming in the car, and that she heard, "my little girl holler, 'Momma, you got the knife on you.'. . . and I just took it off of me, and I put it on her console in the middle." Ms. Jackson asked Ms. Durgan to call her mother, and Ms. Durgan drove Ms. Jackson to the hospital.

Ms. Jackson testified that during the couple of days leading up to the incident, she and Defendant did not argue until Defendant told her he did not want to go out to eat with her family. She explained that they were "talking, you know, for our child. Like, we was in a relationship[,]" but, when he did not want to go eat at Ryan's, she "just didn't want to be in the relationship with . . . him anymore." She testified that "he just never wanted to go anywhere, like, with family when I do things with my family." Ms. Jackson also testified that just prior to them stopping at the intersection of Goos and Mill on the date of the incident, she told Defendant she no longer wanted to be in relationship with him and that she was going to bring him to his mother's house.

The State then called Evidence Officer Jessica Single to testify. She identified numerous photographs that she had taken of Ms. Jackson, Defendant, Ms. Durgan's vehicle, and Ms. Jackson's vehicle on January 28, 2018. She also identified the black steak knife covered in blood that was recovered from Ms. Durgan's vehicle.

The State then called Detective Hope Sanders, a sixteen-year veteran of the Lake Charles Police Department. Detective Sanders testified that she met Ms. Jackson at Lake Charles Memorial Hospital and received an initial statement. She noted that she observed cuts near Ms. Jackson's left ear, the back of her neck on the left side, and a stab wound to the upper part of her right arm. She also was informed that Ms. Jackson also had stab wounds on her back, but she could not see them.

Detective Sanders also testified that she made contact with Defendant at St. Patrick's Hospital that same day. She noted that Defendant had a wound on his left forearm. Detective Sanders further testified that when they recovered Ms. Jackson's phone, the prongs which held the battery in place were broken and the memory card had been removed.

The State then introduced into evidence recordings of two phone calls made by Defendant from jail. While one of the recordings was difficult to understand, Defendant can be heard saying that he had damaged Ms. Jackson's phone. The second recording, which was a call between Defendant and a female, occurred on February 9, 2018, about two weeks after the stabbing. When asked during the call why he would stab Ms. Jackson, Defendant replied he did not know, but he felt she was trying to get him. Defendant further stated during the call that "It wasn't supposed to be like that[,]" and that he "did not want to do that . . . in front of those kids." Defendant then stated that he "tried to get that bitch to come in the house." The female also repeatedly stated that Defendant never put his hands on her.

Detective Sanders also testified that Ms. Jackson had indicated during her initial interview that she and Defendant had gotten into a verbal argument after Defendant had gotten his bag out of her house, asked her to bring him to Goosport, and she refused. According to Detective Sanders, Ms. Jackson had also told her that

9

she and Defendant were arguing when she stopped at Huber Park and that there had been an ongoing argument between them from the time they left Ms. Jackson's mother's house.

The State then called Dr. John Gray, who has spent twenty-two years at Lake Charles Memorial Hospital's Emergency Department. Dr. Gray was stipulated to be an expert in emergency room medicine. Dr. Gray testified he treated Ms. Jackson on January 28, 2018, noting that she had six separate stab wounds in various locations. He stated that two wounds to the back of her thorax region and left back of her neck were worrisome, and that either could have caused the collapsed lung she suffered. Dr. Gray also testified they had to insert a chest tube and that complications therefrom resulted in Ms. Jackson spending ten days in the hospital. Dr. Gray further opined that had Ms. Jackson not been treated quickly, she could have suffered serious cardiac damage and likely death. Dr. Gray did not believe Ms. Jackson lost a life-threatening amount of blood, noting he did not feel it necessary to order a blood transfusion. The State then rested its case after Dr. Gray's testimony.

Against the advice of counsel, Defendant then took the stand on his own behalf at trial. Defendant testified he had lived in Lake Charles since he was three years old. He acknowledged multiple prior convictions for drug offenses, unauthorized entry of an inhabited building, and possession of a weapon in the presence of CDS. On cross-examination, Defendant acknowledged two convictions for distribution of CDS II (crack cocaine) on September 30, 2013.

Defendant further testified that, prior to the stabbing, he had been living with Ms. Jackson since he had been released on parole in the summer of 2017. Defendant claimed that he and Ms. Jackson never argued, but he acknowledged that they were

arguing the day of the stabbing. Defendant acknowledged that in January of 2018, he was involved in a relationship with another woman. Despite saying they were having "relation type misunderstandings," Defendant stated Ms. Jackson was not angry. He stated he was mad because he "wasn't all the way stable, and [he] was probably talking out the side of [his] head to where it made her so fed up."

Defendant further testified that he did not want to go to Ryan's on the day at issue because he and Ms. Jackson were angry with each other. While he initially stated that he could not remember what the subject of the argument was, he later testified that part of the argument was that he believed Ms. Jackson might have been cheating on him. He acknowledged Ms. Jackson told him the relationship was over, and he stated he was okay with that. Nonetheless, he stated he "was more like in a paranoid state of mind frame." He testified he was not understanding the world around him and that he did not remember what happened after he got out of the truck at the intersection of Goos and Mill. According to Defendant, when he got out of the vehicle, his plan was "to talk, I guess." Defendant testified that he never wanted to hurt Ms. Jackson and did not plan on hurting her.

Defendant further testified that he got the steak knife he used to stab Ms. Jackson out of her house while getting his clothes, and he admitted he planned to stab someone that day, just not Ms. Jackson. He claimed the knife was for his own protection but not against Ms. Jackson. Defendant stated that he was scared of Ms. Jackson, but he refused to leave her car because he was on the wrong side of town. Defendant further testified that he was dependent on Ms. Jackson for transportation and a place to live. He additionally admitted to destroying her cell phone the day of the stabbing.

11

At trial, Defendant continued to claim that he was feeling paranoid "from I didn't know who." He explained that although Ms. Jackson knew he was cheating on her, their argument was over his belief that she was cheating on him. He also claimed that Ms. Jackson told him she almost killed him in his sleep. He testified he knew it was Ms. Jackson when he was stabbing her, but claimed he was not trying to kill her. He further testified that he did not know how his arm was wounded, but that it was not from Ms. Jackson. Defendant acknowledged that he was wounded after he exited the vehicle and stated he almost killed himself, but not intentionally. After Defendant's testimony, Defense counsel rested their case without calling any other witnesses.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent.

## ASSIGNMENT OF ERROR NO.1:

In his first assignment of error, Defendant contends the evidence presented at trial is insufficient to support his conviction for attempted second degree murder. Defendant's argument is two-pronged, as he contends the State failed to prove beyond a reasonable doubt that he possessed the specific intent to kill Ms. Jackson as required to sustain a conviction for either attempted second degree murder or attempted manslaughter. Additionally, he contends that even if he had specific intent to kill, he proved the mitigating factors of sudden passion or heat of blood by a preponderance of evidence, thus necessitating a verdict of attempted manslaughter.

The analysis for insufficiency of evidence claims is well settled:

12

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

*SPECIFIC INTENT*:

Initially, we will address Defendant's claim that the State failed to prove he had the specific intent to kill Ms. Jackson.

> To support a conviction for attempted manslaughter, the state must prove the defendant specifically intended to kill the victim and committed an overt act in furtherance of that goal. *State v. Glover*, 47,311 (La. App. 2 Cir. 10/10/12), 106 So.3d 129, *writ denied*, 12-2667 (La. 5/24/13), 116 So.3d 659; *State v. Leone*, 48,892 (La. App. 2 Cir. 5/15/14), 140 So.3d 793, *writ denied*, 14-1337 (La. 4/10/15), 163 So.3d 804.
>
> Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); *State v. Glover*, *supra*; *State v. Leone*, *supra*. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and review of that determination is to be guided by the standard of *Jackson v. Virginia*, [443 U.S. 307, 99 S.Ct. 2781 (1979)]; *State v. Glover*, *supra*; *State v. Leone*, *supra*.

*State v. Lambert*, 52,004, p. 6 (La.App 2 Cir. 5/23/18), 248 So.3d 621, 624-25.

Defendant contends that Ms. Durgan's testimony that he and Ms. Jackson were in the road arguing prior to him stabbing Ms. Jackson indicates the stabbing was not planned. Defendant also contends that Mr. Porter's belief that Defendant was "on something" further supports the notion Defendant lacked specific intent to kill Ms. Jackson. Defendant also argues he armed himself out of fear of some unknown other person, and that the State failed to show he was angry or mad at Ms. Jackson. We note, however, these claims conflict with Defendant's own testimony that the reason he refused to go to Ryan's initially was because he and Ms. Jackson were already angry with each other and he did not want to be around family while they were angry.

As noted in *Lambert*, "[s]pecific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *Id*. Here, Defendant has admitted he was angry with Ms. Jackson because he believed she was cheating on him and that he was angry with her when he went into the house and armed himself with a knife out of Ms. Jackson's kitchen. Additionally, uncontested testimony established that after initially stabbing Ms. Jackson multiple times, Defendant chased her down while she was attempting to flee and stabbed her a few more times when she fell. Of the six stab wounds Defendant inflicted upon the victim, Dr. Gray noted that two of them would likely have been fatal had Ms. Jackson not received immediate treatment. Furthermore, Ms. Jackson was in the hospital for over a week following the attack. Defendant's actions, specifically his decision to chase Ms. Jackson down and stab her a few more times after she had initially escaped from him, support a finding that Defendant had an intent to kill.

As noted by the second circuit in *State v. Lynn*, 53,189, p. 17 (La.App. 2 Cir. 1/15/20), 288 So.3d 881, 893, *writ granted on other grounds*, 20-283 (La. 6/3/20),

14

___ So.3d ___, "[s]pecific intent to kill may also be inferred from the extent and severity of the victim's injuries." Therein, the second circuit found the defendant's repeated strikes to the victim's head with a metal pole established a specific intent to kill. The victim suffered a fractured skull, had to have a synthetic implant to replace part of his skull, and lost the use of his right side due to the brain injury.

In *State v. Youngblood*, 18-445, p. 5 (La.App. 5 Cir. 5/22/19), 274 So.3d 716, 727, *writ granted on other grounds*, 19-1160 (La. 6/3/20), ___ So.3d ___, the court noted "[s]pecific intent to kill can be inferred from the intentional use of a deadly weapon such as a knife or a gun." Likewise, this court in *State v. Bias*, 18-268 (La.App. 3 Cir. 2/6/19), 265 So.3d 821, *writ denied*, 19-416 (La. 4/22/19), 268 So.3d 300, found a jury could reasonably find specific intent to kill where the defendant had grabbed a knife and told the victim he was going to kill her before stabbing her four times.

In light of *Lynn*, *Youngblood*, and *Bias*, and viewing the evidence in the light most favorable to the prosecution, we find that the jury could have reasonably found Defendant had the specific intent to kill Ms. Jackson. As such, the State presented sufficient evidence to support Defendant's conviction for attempted second degree murder.

## ATTEMPTED MANSLAUGHTER

Defendant argues that, even if the evidence was sufficient to support a finding that he had specific intent to kill Ms. Jackson, he should have only been convicted of attempted manslaughter because he believes he proved the mitigating factors of "sudden passion" or "heat of blood." Specifically, he asserts "[t]he evidence admitted at trial sufficiently proved the mitigating factors of heat of blood and sudden passion resulting from the escalating argument between the two about

Jackson's alleged infidelity, Moore's refusal to interact socially with Jackson's family, and the end of their relationship." Furthermore, Defendant argues there was no time for him to cool off because the argument was ongoing until the moment he stabbed Ms. Jackson.

Manslaughter is appropriately defined by La.R.S. 14:31(A)(1) as:

A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

However, this court has previously stated that "an argument alone is not sufficient provocation to support a verdict of manslaughter." *State v. Johnson*, 06-623, p. 11 (La.App. 3 Cir. 11/2/06), 941 So.2d 696, 704, *writ denied*, 06-3024 (La. 9/14/07), 963 So.2d 995. Despite Defendant's argument that he had no time to cool off, there is no evidence of any provocation other than an argument. Ms. Jackson testified she has never struck Defendant, and there was no testimony from Defendant suggesting that Ms. Jackson ever struck him. As an argument alone cannot change murder into manslaughter, Defendant's claim that his argument with Ms. Jackson was sufficient provocation to change his attempted murder into attempted manslaughter lacks merit. In light of the above, and in viewing the evidence in the light most favorable to the prosecution, we cannot say the jury erred in finding the State proved its case beyond a reasonable doubt.

**ASSIGNMENTS OF ERROR NOS. 2 AND 3:**

In his second assignment of error, Defendant contends "[t]he sentence imposed by the trial court violates the Eighth Amendment of the Constitution of the

16

United States and La. Constit. Art. I, § 20, as it is nothing more than cruel and unusual punishment and, thus, excessive." Defendant was convicted of attempted second degree murder, which under La.R.S. 14:27(D)(1)(a), mandates imprisonment "at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence." Accordingly, Defendant's sentence of fifty years at hard labor without benefits represents a maximum sentence. Defendant also contends the trial court failed to properly consider the mitigating factors listed in La.Code Crim.P. art. 894.1. In his third and final assignment of error, Defendant contends that his trial counsel was ineffective for failing to file a contemporaneous objection or raise the issue of the trial court's failure to properly consider the factors listed in La.Code Crim.P. art. 894.1 in the motion to reconsider.

> In order to prevail on his ineffective assistance claims, Defendant must satisfy a two-part test. First, Defendant must show his counsel's performance was deficient; second, he must show the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). Additionally, this Court in [*State v.*] *Reed*, [00-1537, p. 22 (La.App. 3 Cir. 3/6/02),] 809 So.2d [1261,] at 1275[, *writ denied*, 02-1313 (La. 4/25/03), 842 So.2d 391] (emphasis added), affirmed "that there could be a basis for an ineffective assistance claim if a defendant can show a reasonable probability that, had counsel filed or made a motion to reconsider the sentence, *the sentence would have been different*." As failure to prove prejudice renders the question of deficient performance moot, we will review Defendant's two assignments of error simultaneously.

*State v. Monceaux*, 17-1052, p. 3 (La.App. 3 Cir. 5/9/18) (unpublished opinion).

As a defendant's failure to prove prejudice will render any question of deficient performance moot, we will evaluate the alleged excessiveness of Defendant's sentence as if trial counsel had raised the issues of mitigating factors. For the reasons listed below, we find Defendant cannot prove he would have received a different sentence, he cannot prove prejudice, and therefore his ineffective assistance of counsel claim lacks merit.

17

Defendant, who was convicted of the attempted second degree murder of his sometime girlfriend Ms. Jackson, the mother of his daughter, was sentenced to serve the maximum fifty years at hard labor without benefit of probation, parole, or suspension of sentence. The trial court suggested it was not sure fifty years was sufficient punishment and noted:

> I think with your criminal history, and the evil nature of your crime, and your lack of remorse, and I think your apology today is just -- is just only self-serving to try to minimize your sentence. I don't think you've demonstrated any amount, throughout this process, of true remorse. And everything about this crime shows that you -- you have no regard for anybody but yourself. And -- And so I find that 50 years is the only just sentence in this case.

The trial court also stated:

> I considered all the aggravating and mitigating factors associated -- In fact, I don't find that there are any mitigating factors, at all, in -- in -- in 894.1. I find that there are none, only aggravating factors. And -- But I have considered all those factors in 894.1, and I'm going to -- The sentencing range is -- the maximum -- the maximum amount of time is 50 years.

On appeal, Defendant's primary complaints regarding his maximum sentence are that his prior convictions are not violent offenses, but rather were drug-related, that the trial court did not consider his mental health issues a mitigating factor that diminished his capacity, as well as the trial court's conclusion that his two apologies to Ms. Jackson were not sincere but were instead simply self-serving.

We note that although Defendant is correct that his prior convictions were not for violent offenses, Defendant has been consistently in trouble with the law his entire adult life. Defendant was born on June 29, 1986; he first received adult probation in April of 2004, when he was only seventeen years old. Additionally, at the time of Defendant's sentencing, he had four pending charges arising from his time in custody since the stabbing of Ms. Jackson: battery of a correctional facility

18

employee by a prisoner, battery of a police officer, and two counts of simple battery, which both occurred in May of 2019.

Additionally the Presentence Investigation (PSI) in this case noted that Defendant had "demonstrated aggressive behavior and ha[d] been in multiple fights since incarceration." Additionally, the PSI noted eight juvenile adjudications and relayed that Defendant had been either on home supervision or else detained with the State of Louisiana Office of Juvenile Justice from the age of thirteen until his arrest on felony charges in 2004.

Regarding Defendant's complaint that the trial court failed to consider his mental health issues a mitigating factor, we note the following mitigating circumstances listed in La.Code Crim.P. art. 894.1(A):

> (22) The defendant's criminal conduct neither caused nor threatened serious harm.
>
> (23) The defendant did not contemplate that his criminal conduct would cause or threaten serious harm.
>
> (24) The defendant acted under strong provocation.
>
> (25) There were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense.
>
> (26) The victim of the defendant's criminal conduct induced or facilitated its commission.
>
> (27) The defendant has compensated or will compensate the victim of his criminal conduct for the damage or injury that he sustained.
>
> (28) The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the instant crime.
>
> (29) The defendant's criminal conduct was the result of circumstances unlikely to recur.
>
> (30) The defendant is particularly likely to respond affirmatively to probationary treatment.

(31) The imprisonment of the defendant would entail excessive hardship to himself or his dependents.

(32) The defendant has voluntarily participated in a pretrial drug testing program.

(33) Any other relevant mitigating circumstance.

Defendant, acknowledging that mental health status is not a specifically listed mitigating factor under La.Code Crim.P. art. 894.1, nevertheless contends his mental health issues should have been considered as circumstances which tended to excuse or justify his actions under the catch-all "any other relevant mitigating circumstance" category. Defendant's mental health issues included multiple hospitalizations at Lake Charles Memorial Hospital in the five years leading up to his stabbing of Ms. Jackson, with symptoms for his admissions including paranoia and insomnia. Nonetheless, we note there were numerous aggravating factors present, including the use of a deadly weapon, the violent nature of stabbing Ms. Jackson multiple times, performing the stabbing in front of the Ms. Jackson's children, and Ms. Jackson's reported long-term health complications arising from the collapsed lung suffered during the stabbing. The trial court made it clear at sentencing that it felt Defendant's actions were evil and that he was unfit to be a part of society. We conclude that the trial court would not have found, and apparently did not find, Defendant's mental health issues sufficient mitigation to enact a less severe sentence.

Finally, with regard to Defendant's claim that his apologies to Ms. Jackson should have been considered a mitigating circumstance, we note that the trial court was in a better position to determine the sincerity of Defendant's apologies than this court, which is presented with nothing more than a cold transcript to review. Given the trial court's ability to observe Defendant during his apologies, we will defer to

20

the trial court's interpretation unless it is unsupported by the record. Defendant's first apology came while the jury was deliberating:

> I just want to -- I just want to let y'all know, Cloee, it hurt, you know, because the -- you know, you my little girl['s] mother. But if I never see you again, I just want to say you didn't deserve that, you or your family.

> You know, I wish y'all could rest in peace, heal, forgive me. I forgive y'all. And I just wish y'all the best. God bless y'all. Deeply, I apologize. I'm really sorry, truly, that this even much happened.

> I don't know what else to say. It hurt. I made the decision, at the end of the day, I guess. So I forgive you. I just hope you forgive me and can rest at night, you and your family.

Immediately prior to sentencing, Defendant again addressed Ms. Jackson: "I just want to send my -- you know apologize to -- She didn't deserve that, and let her know I'm sorry. That's it." We find nothing in these apologies indicating the trial court's interpretation of them was erroneous, particularly in light of Defendant's repeated claim that he forgives Ms. Jackson, whom he stabbed repeatedly without provocation. Given the trial court's ability to observe the Defendant while making these claims, there is no reason to disturb the court's conclusion that the statements were merely self-serving rather than true remorse.

Finally, we note that Defendant received a maximum sentence for his crime. Generally, "maximum sentences are reserved for cases involving the most serious violations of the charged offense and for the worst kind of offender." *State v. Quebedeaux*, 424 So.2d 1009, 1014 (La.1982). Nonetheless, this court has upheld maximum sentences for attempted second degree murder on numerous occasions. *See State v. Guillory*, 10-1175 (La.App. 3 Cir. 4/6/11), 61 So.3d 801; *State v. Sarpy*, 10-700 (La.App. 3 Cir. 12/8/10), 52 So.3d 1032, *writ denied*, 11-46 (La. 6/3/11), 63 So.3d 1006. Additionally, this court has upheld an eighty-year sentence for a second

felony offender convicted of attempted second degree murder. *See State v. George*, 09-143 (La.App. 3 Cir. 10/7/09), 19 So.3d 614. Further, Defendant's PSI listed him as a fifth felony offender. Under La.R.S. 15:529.1(A)(4), Defendant's sentencing range would be not less than fifty years to not more than one-hundred years imprisonment. In light of Defendant's status as a multiple-felony offender, we conclude the trial court did not abuse its considerable discretion in imposing a maximum sentence.

Given our determination the trial court did not abuse its discretion in imposing a maximum sentence, Defendant cannot prove the requisite prejudice to support his claim of ineffective assistance of counsel. As such, there is no merit to Defendant's final assignments of error.

**DECREE**

For the reasons set forth above, Defendant's conviction and sentence are hereby be affirmed.

**AFFIRMED.**