STONE, J.
The defendant, C.B.,[1] was adjudicated delinquent on one count of aggravated battery *565 in violation of La. R.S. 14:34 and two counts of aggravated assault with a firearm in violation of La. R.S. 14:37.4. C.B. was ordered to serve one year in a non-secure program for aggravated battery and one year in a non-secure program for each count of aggravated assault with a firearm. The trial court ordered the dispositions for aggravated assault with a firearm to run concurrently with one another and consecutively with the disposition for aggravated battery. On appeal, C.B. argues there was insufficient evidence to adjudicate him as a delinquent and that his dispositions are excessive.[2] For the following reasons, we affirm C.B.'s adjudications and dispositions.
FACTS AND PROCEDURAL HISTORY
On October 25, 2017, 15 year-old C.B. was involved in a physical altercation with K.J. C.B. was arrested and subsequently charged with one count of aggravated battery in violation of La. R.S. 14:34 and two counts of aggravated assault with a firearm in violation of La. R.S. 14:37.4. Thereafter, C.B. was adjudicated delinquent on all counts. On January 22, 2018, the trial court ordered C.B. be committed to the Louisiana Office of Juvenile Justice ("OJJ") to serve one year for aggravated battery and one year each for the two counts of aggravated assault with a firearm. The trial court ordered the dispositions for aggravated assault with a firearm run concurrently with each other and consecutively with the disposition for aggravated battery. On appeal, C.B. argues the evidence was insufficient to prove he committed an aggravated battery or aggravated assault with a firearm. C.B. also argues the dispositions imposed are harsh and excessive.
DISCUSSION
Sufficiency of Evidence
The standard of appellate review for a sufficiency of the evidence claim under Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. See also State v. Carter , 42,894 (La. App. 2 Cir. 1/09/08), 974 So.2d 181, writ denied , 08-0499 (La. 11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 1/14/09), 1 So.3d 833, 837, writ denied , 2009-0310 (La. 11/6/09), 21 So.3d 297.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed , 43,786 (La. App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied , 09-0372 (La. 11/6/09), 21 So.3d 299. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette , 43,032 (La. App. 2 Cir. 2/13/08), 975 So.2d 753. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. Not only *566 does the standard of review in Jackson , supra , apply to juvenile delinquency adjudicatory hearings, but our state constitution mandates that we determine, after reviewing the record evidence, whether the juvenile court was clearly wrong in its fact findings. Id.
In order for the court to adjudicate a child delinquent, the state must prove beyond a reasonable doubt that the child committed a delinquent act alleged in the petition. La. Ch. C. art. 883. In a juvenile case, the reviewing court is constitutionally compelled to review both facts and law. La. Const. art. V, § 10 (A) and (B). However, the reviewing court must recognize that the juvenile judge observed the conduct and demeanor of the witnesses and was in the best position to determine credibility and weigh the evidence. State In Interest of D.R. , 50,594 (La. App. 2 Cir. 2/24/16), 188 So.3d 1116, 1120. Therefore, this Court grants great deference to the juvenile court's factual findings and credibility determinations and assessment of the weight of particular testimony. Id.
A battery is the intentional use of force or violence upon the person of another. La. R.S. 14:33. Aggravated battery is a battery committed with a dangerous weapon. La. R.S. 14:34. A "dangerous weapon" includes any "instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm." La. R.S. 14:2(A)(3). As a matter of law, a gun, or firearm, is a dangerous weapon. See State v. Bonier , 367 So.2d 824 (La. 1979).
To convict a defendant of aggravated assault with a firearm, the state has to prove the defendant made an attempt to commit a battery, or intentionally placed the victim in reasonable apprehension of receiving a battery by the discharge of a firearm. State v. McCoy , 45,090 (La. App. 2 Cir. 4/14/10), 34 So.3d 1145. A discharge of the firearm is not an element of the offense. State v. Lafleur , 16-467 (La. App. 3 Cir. 1/4/17), 209 So.3d 927, writ denied , 17-0808 (La. 1/29/18), 235 So.3d 1104. (See also La. R.S. 14:37.4, which the Louisiana Legislature amended in 2012 to exclude the phrase "by the discharge of" and added the word "with," thereby eliminating the element of "discharge" of a firearm. 2012 La. Acts No. 320, § 1.)
During the adjudication hearing, L.P. testified that on October 25, 2017, he and K.J. were sitting in a friend's backyard when C.B. and another young man, E.M., walked up to them. L.P. stated C.B. brandished a gun but he and K.J. were not afraid because they knew the gun was a "dud" and did not function properly. L.P. described the gun as a .38 semi-automatic silver gun with clear tape on the handle. He stated he knew this because C.B. had shown him the gun a week earlier and told him it was a .38. L.P. also claimed C.B. told him there was no chamber in the gun and it did not work.
L.P. testified C.B. and E.M. walked away but returned and C.B. began punching K.J. L.P. stated that during the fight, he saw C.B. hit K.J. in the head with the gun, and he heard K.J. yell out that he had gotten hit with the gun. L.P. testified that K.J. had a mark on the side of his head. L.P. recalled that after the fight, C.B. ran off with the gun. L.P. also stated that there were no poles, bricks or anything other than grass where the fight took place.
Chad McCoy ("McCoy"), L.P.'s father, testified he received a call from his son so he went to the Wilkinson Terrace Apartments. Upon his arrival, he observed C.B. threatening a young lady with a "little small, black handgun." McCoy indicated he saw K.J. bleeding from the head and that K.J. told him C.B. had hit him in the head with a gun. According to McCoy, *567 C.B. was gone by the time the police arrived.
W.C1. and W.C2., C.B.'s 13-year-old twin brothers, testified at trial. W.C1. testified he saw the fight between C.B. and K.J. from his sister's bedroom window. W.C1. claimed he saw punching, but did not see a gun. When asked by the trial court "who threw the first punch," W.C1. indicated he "clearly" saw K.J. start the fight.
W.C2. corroborated most of W.C1.'s testimony including the notion that he did not see anything in anyone's hand during the fight. W.C2. admitted that when the fight started he was in the living room and did not have a clear view. W.C2. also admitted that after the fight began, he ran outside to assist his brother in fighting K.J.
D.J. testified that she, her two sisters, A.R. and J.R., and their mother were home when a friend informed them that E.M. had been involved in a fight. D.J. stated that she, her sisters, and their mother walked outside where they encountered C.B. D.J.'s mother asked C.B. about the fight and, according to D.J., C.B. had no explanation, but instead resorted to yelling and talking about D.J.'s uncle, calling him a "sissy" and a "fag." The girls began defending their uncle to C.B. and eventually the group started arguing. D.J. recalled that at some point during the argument, C.B. pulled a gun from his side, pointed it at her and her sisters, and said he would shoot her and the "whole projects up." D.J. stated she felt threatened and feared for her life so she and her sister called the police. She described the gun as having "something white wrapped around it" and "a hole in the top where the bullets go."
A.R. corroborated much of D.J.'s testimony and described the gun as "a real gun...a little gun with like a white piece on it[.]" A.R. stated C.B. pulled the gun from his side when they were arguing about her uncle, but he did not fire it.
C.B. also testified during the adjudication hearing. C.B. explained that he was walking in the fire lane on the evening of October 25, 2017, when his friend, E.M., approached him and told him K.J. was bragging about having sexual intercourse with C.B.'s best friend's 15-year-old sister. C.B. claimed he viewed the girl as his own sister so he decided to confront K.J. C.B. admitted starting the fight with K.J. but denied having a gun. C.B. testified that he punched K.J. and, when K.J. fell, he hit his head on a clothesline pole. C.B. conceded to being involved in a verbal altercation with D.J., A.R., J.R., and their mother, but adamantly denied having a gun during the altercation. C.B. also alleged one of the girls put her hand on his shoulder and "got in his face," but claimed he simply moved her hand and walked away.
Officer J. Couch ("Officer Couch") of Shreveport Police Department testified that he responded to a battery call at the Wilkinson Terrace Apartments and, upon his arrival, spoke with K.J. He testified that K.J. stated he had been in a fight, and he observed a laceration on K.J.'s head. Witnesses at the scene told him that during the altercation, a gun was used to hit K.J. in the head. The witnesses identified C.B. as the person who hit K.J. Officer Couch indicated D.J., A.R., J.R., and their mother approached him and reported that C.B. pointed a gun at them. Officer Couch stated he looked for a gun but did not find one.
The trial court noted that C.B. admitted starting the fight and found credible the testimony that C.B. had a gun. The trial court determined W.C1.'s testimony was not credible because W.C1. clearly lied when he said K.J. had thrown the first punch despite C.B.'s admission that he was *568 the one who started the fight. Likewise, the trial court did not afford much weight to W.C2.'s testimony, finding that because W.C2. tried to join the fight, he could have easily missed seeing the gun. With no evidence directly contradicting L.P. and McCoy's testimony that C.B. had a gun, the trial court adjudicated C.B. delinquent on the charge of aggravated battery of K.J. The trial court also found credible the sisters' testimony that C.B. threatened them with a gun and adjudicated C.B. delinquent on two charges of aggravated assault with a firearm.
We find the evidence, viewed in a light most favorable to the prosecution, supports C.B.'s adjudication as delinquent for aggravated battery and aggravated assault with a firearm. A witnesses testified they observed C.B. with a handgun when he admittedly initiated the fight with K.J. L.P. saw C.B. hit K.J. on the head with a gun. The record reflects K.J. sustained a laceration to the side of his head from an object. The only testimony that C.B. did not have a gun was C.B.'s own self-serving testimony and that of his twin brothers who simply stated they did not see C.B. with a gun. The record contains more than sufficient evidence to support the reasonable conclusion that C.B. was armed with a handgun which he used to strike K.J. on the head. With no credible evidence to the contrary, the trial judge was reasonable in finding C.B. delinquent of the charge of aggravated battery.
Likewise, D.J. and A.R. both testified C.B. was armed with a gun, which he brandished at them as the group was verbally sparring over the girls' uncle. Both girls described the gun and no evidence was presented contradicting their testimony. The state carried its burden of proving C.B., armed with a dangerous weapon, placed the girls in apprehension of being shot.
In arguing the evidence is insufficient, C.B. contends that even if there was a gun, the gun was inoperable and cannot be considered a dangerous weapon that is capable of causing death or great bodily harm or placing another in reasonable apprehension of receiving a battery. "The use of an inherently harmless object in a manner that creates circumstances likely to produce death or great bodily harm results in the inherently harmless object being a dangerous weapon within the provisions of La. R.S. 14:2(3) and 14:64." State v. Levi , 259 La. 591, 250 So.2d 751, 754 (1971) ; State ex rel. W.H. , 10-1418 (La. App. 4 Cir. 4/6/11), 62 So.3d 839. Courts have treated an inoperable gun similarly to a toy gun in this analysis. State ex rel. W.H., supra . In order to find that a toy pistol is a dangerous weapon within the provisions of La. R.S. 14:2(3) and 14:64, the trier of fact must consider the manner in which the defendant used the toy pistol and the effect this use had upon the victim. State v. Kemp , 39,358 (La. App. 2 Cir. 3/11/05), 896 So.2d 349, 357, writ denied , 2005-0937 (La. 12/9/05), 916 So.2d 1052 ; State ex rel. W.H., supra . See also State v. Green , 409 So.2d 563, 565 (La. 1982). When considering the first prong, the manner of use, of this two-prong test, the court must decide if "the interaction between the offender and the victim created a highly charged atmosphere." Id. When considering the second prong, the effect of use, the court must decide if there was a danger of serious bodily harm resulting from the victim's fear for his life. Id.
Whether the gun at issue was operable is not determinative. So long as the weapon was used by C.B. in such a way as to excite fear and apprehension in D.J. and A.R., it is considered a dangerous weapon under the law. Furthermore, there was no evidence presented that the girls had any *569 knowledge about the capacity of the gun to actually fire. Therefore, the facts support the conclusion that even if it was an inoperable gun, the manner in which it was used and the effect it had on the victims was enough to classify it as a dangerous weapon within the language of La. R.S. 14:2(3) and 14:64. Therefore, we find there was a reasonable basis for the trial court's finding C.B. delinquent of two counts of aggravated assault with a firearm.
Excessive Dispositions
C.B. argues the dispositions imposed by the trial court are constitutionally harsh and excessive considering the nature of the case and because he is not among the worst offenders. In particular, C.B. opposes the consecutive nature of the sentences. La. Ch. C. art. 898 requires that "[n]o disposition shall remain in force for a period exceeding the maximum term of imprisonment for the felony forming the basis for the adjudication." Nevertheless, a sentence within the statutory limit may violate a defendant's constitutional right against excessive punishment. State ex rel. J.A. , 46,649 (La. App. 2 Cir. 8/10/11), 73 So.3d 981 ; State v. Sepulvado , 367 So.2d 762 (La. 1979). A sentencing judge does not possess unbridled discretion to impose a sentence within statutory limits, regardless of mitigating facts. La. Const. art. I, § 20. Paragraph D of La. Ch. C. art. 901 lists the mitigating factors for the trial court's consideration in fashioning an appropriate disposition for a juvenile and states the grounds, while not controlling the discretion of the court, shall be accorded weight in the determination of suspension of the disposition or probation.
In State in the Interest of T.L. , 674 So.2d 1122 (La. App. 2 Cir. 5/8/96), this Court stated that the judge adjudicating a child delinquent should impose the least restrictive disposition consistent with the circumstances of the case, the needs of the child, and the best interest of society. In any review of an adjudication of delinquency for constitutional excessiveness, the appellate court must first ascertain whether the lower tribunal took cognizance of the circumstances of the case, the needs of the child, and the best interest of society, and whether the record reflects an adequate factual basis for the commitment imposed. State ex rel. J.A., supra . The test to be used in deciding whether the sentence imposed was excessive requires consideration of whether the sentencing judge took cognizance of the guidelines' criteria and whether the sentence was too severe in light of the circumstances and the juvenile's background. Absent a showing of manifest abuse of this wide discretion, the disposition in a juvenile delinquency proceeding will not be set aside as constitutionally excessive. Id.
In advance of C.B.'s disposition hearing, Officer Leasa Stephens ("Officer Stephens"), C.B.'s probation officer, prepared a predisposition report. In Officer Stephens' report, she recommended that C.B. be committed until his 21st birthday based on C.B.'s disruptive and disobedient behavior during his time in detention. Officer Stephens indicated she did not believe C.B. took the trial court's authority seriously based on his fighting, use of vulgar language, inappropriate comments, and sexual comments to female staff at the detention center.
The trial court noted that C.B. had already served an unusually lengthy time of 60 days in detention. He indicated that he had initially been inclined to release C.B. on time served with strict conditions of probation. However, after learning of C.B.'s behavior while in detention, the trial court became convinced C.B. did not warrant a lenient disposition and explained:
He did not seem to learn anything while being held in detention. He did not seem *570 to learn that you obey authority figures, wherever you might find them. He did not seem to learn basic fundamental principles of respect for others, whether they're in authority or not. Some of the language he used about female staff is inexcusable and indicates a deep seeded disrespect, if not hatred of, females. That is very worrisome.
The trial court also expressed concern for C.B.'s family in the event of his release. The trial court indicated the apartment complex manager was planning to evict the family if C.B. returned due to his possession of a firearm on the property. Consequently, the trial court committed C.B. to the OJJ for one year for each count of aggravated assault with a firearm, to run concurrently, and one additional year for aggravated battery, to run consecutively to the aggravated assault dispositions.
This Court finds the dispositions rendered by the trial court were well tailored to the facts in this case. C.B. committed serious offenses by beating K.J. with a gun and then threatening others with the gun. The trial court described the length of the imposed detention ordered as unusually harsh; however, he expressed grave concern over C.B.'s poor behavior, violent reactions, and crude insults to women during his 60 days in detention prior to disposition. Regarding the consecutive nature of the disposition, the trial court stated there were two distinct incidents here, with a period of time in between during which C.B. could have calmed down and considered his actions. In support of its decision to run the dispositions consecutively, the trial court stated the following:
The Court understands the nature of the timing of those offenses, but they were completely separate incidents, in that C.B. had the opportunity to deviate from his behavior and he did not. So I think it justifies considering them as two separate incidents.
In cases involving multiple offenses and sentences, the trial court has limited discretion to order that the multiple sentences are to be served concurrently or consecutively. When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883. Concurrent sentences arising out of a single course of conduct are not mandatory, and consecutive sentences under those circumstances are not necessarily excessive. State v. Hebert , 50,163 (La. App. 2 Cir. 11/18/15), 181 So.3d 795. It is within the court's discretion to make sentences consecutive rather than concurrent. State v. Robinson , 49,677 (La. App. 2 Cir. 4/15/15), 163 So.3d 829, writ denied , 15-0924 (La. 4/15/16), 191 So.3d 1034.
The trial court clearly believed the two incidents were unrelated enough to warrant two consequences and the record supports such conclusion. Notably, the trial court did not to impose the maximum exposure as recommended by the probation officer. Considering C.B.'s senseless acts of striking his peer with a gun during a fight which he provoked and threatening others who posed no danger to him with that same gun, we find C.B.'s dispositions are not severe in light of the circumstances, and the trial court was not manifestly erroneous in its imposed dispositions.
CONCLUSION
For the aforementioned reasons, C.B.'s adjudications and dispositions are affirmed.
AFFIRMED

In order to maintain confidentiality of the proceedings, as required by La. Ch. C. art. 412 and U.R.C.A. Rule 5-2, minors are referred to by initials.

These appeals were consolidated by this Court.