Judgment rendered August 11, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,980-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
C.L.

* * * * *

Appealed from the
Caddo Parish Juvenile Court
Parish of Caddo, Louisiana
Trial Court No. 163107

Honorable Bobby L. Stromile, Judge (*Pro Tempore*)

* * * * *

| | |
|---|---|
| THE HATCH LAW FIRM, LLC<br>By: Christopher Hatch | Counsel for Appellant,<br>C.L., Child |
| JAMES E. STEWART, SR.<br>District Attorney | Counsel for Appellee,<br>State of Louisiana |
| AUDIE L. JONES<br>Assistant District Attorney | |

* * * * *

Before PITMAN, COX, and HUNTER, JJ.

**HUNTER, J.**

The juvenile, C.L.,[1] was adjudicated as delinquent for the offense of third degree rape, a violation of La. R.S. 14:43. The Caddo Parish Juvenile Court's disposition committed C.L. to the custody of the Office of Juvenile Justice ("OJJ") for two years, with all but six months suspended and credit for time served. The juvenile now appeals his adjudication. For the following reasons, we affirm C.L.'s adjudication and disposition and remand the matter with instructions.

## FACTS

In February 2020, the parents of C.D., a minor, filed a report with the Caddo Parish Sheriff's Office asserting another minor, C.L., had sexually abused their son. Several days later, Lacie Hadley, a forensic interviewer with the Gingerbread House, conducted interviews with C.D. and an eyewitness, D.S., also a minor.

In his statement, C.D., age ten at the time of the interview, stated the incident occurred midday, several years before when school was not in session, while C.D. was playing with his friends and neighbors, D.S. and C.L. C.D. told the interviewer at the time of the incident he was age six or seven; D.S. was age eleven or twelve; and C.L. was age thirteen or fourteen. C.D. further stated the three boys rode four-wheelers together on the nearby levee, with C.L. and C.D. on one vehicle and D.S. on the other. C.D. stated he "blacked out," and when he "woke up," he and the other two boys were in a shed belonging to C.L.'s uncle or grandfather.

---

[1] Pursuant to U.R.C.A. 5-2, the juveniles in this matter are identified by their initials. In accordance with La. R.S. 46:1844(W), the sexual offense victim's family members are also identified by their initials.

C.D. stated he saw his pants were pulled down and C.L. was raping him. C.D. further stated his pants and underwear and C.L.'s pants and underwear were "not fully on." C.D. told the interviewer he was on his stomach with his butt showing and did not know "if he did it or not." C.D. said he did not feel anything and did not hurt anywhere. C.D. said D.S. saw what happened when he walked in and began fighting C.L. C.D. said he pulled up his pants and went home. C.D. told the interviewer he did not tell anyone at the time because he was afraid they would say he was lying.

C.D. said he did not speak about the incident with D.S. until 2020, just a couple of weeks before C.D.'s Gingerbread House interview. C.D. told the interviewer he was reminded of the incident while playing an online game on his console with an unknown boy who mentioned how something similar had happened to him. C.D. later told his older brother about the incident.

D.S., who was fourteen at the time of the interview, told the interviewer the incident occurred three or four years ago, in the summer when school was out. D.S. said he was ten or eleven at the time and C.L. was twelve or thirteen. D.S. told the interviewer he, C.L. and C.D. played football on the day of the incident and later, when the three of them went into the shed, C.L. and C.D. began "having sex." D.S. said he was sitting to the side, playing on his phone. D.S. told the interviewer C.L. and C.D. both had their shirts on, but they were not wearing pants or underwear. D.S. said both C.L. and C.D. were on their knees, and C.D. was bent over. D.S. told the interviewer he saw when C.L. "stuck it in his butthole." D.S. said C.D. told C.L. to stop, and C.L. pulled out. D.S. insisted to the interviewer C.L. and C.D. were having sex together. D.S. explained to the interviewer he

knew they both wanted to do it because when C.D. told C.L. to stop, C.L. stopped.

D.S. told the interviewer he did not do or say anything when the incident happened and he and C.D. never spoke about it until just a few weeks before the Gingerbread House interview, when C.D. brought it up to him. D.S. said he replied no when C.D. asked him if he recalled the time when C.L. kidnapped him, knocked him out, and raped him. D.S. told the interviewer C.D. lied in telling everyone C.L. kidnapped him and hit him.

In May 2020, a petition was filed charging C.L., who was twelve or thirteen at the time of the offense, with the first degree (aggravated) rape of C.D., then six years old, between the dates of June 1, 2016, and August 30, 2016, a violation of La. R.S. 14:42. C.L. entered a denial and was released to his mother.

At the adjudication hearing, D.S., who was fifteen at trial, testified the incident occurred at the property of C.L.'s uncle. D.S. further testified he, C.L., and C.D. were present and it occurred during the summer when they were out of school. D.S. identified C.L. in court. D.S. denied they rode four-wheelers on the day in question. D.S. testified C.D. lied about being kidnapped and knocked out, and further C.D. tried to get D.S. to lie to C.D.'s brother when they were talking in the group chat while playing a video game. D.S. testified after playing football together, the three boys went into the uncle's shed, where C.L. and C.D. had their clothes partly removed. D.S. stated he did not recall what happened in the shed and he "really didn't see anything."

On cross-examination, D.S. admitted he did see C.L. do something sexually inappropriate to C.D. Specifically, D.S. testified "Like I just saw

3

them, like, touching each other." D.S. also testified he did not lie to the Gingerbread House interviewer and admitted everything he told her was true. D.S. insisted he was telling the truth during his Gingerbread statement and during his trial testimony. Portions of D.S.'s Gingerbread House interview were played in court and D.S. confirmed his statements.

Lacie Hadley, the forensic interviewer for the Gingerbread House, testified when she interviewed C.D. on February 20, 2020, no relatives or attorneys were present, and a law enforcement officer observed the interview from an adjacent room via a livestream. Detective Larry Pierce, of the Caddo Parish Sheriff's Office, testified he observed C.D.'s Gingerbread House interview with Hadley via the livestream video feed and investigated the allegations against C.L. Det. Pierce stated he determined from his investigation the incident of sexual abuse occurred during the summer of 2016, in Shreveport, Louisiana. Det. Pierce testified while there were some discrepancies in the statements of C.D. and D.S. as to how the children ended up in the shed, their statements regarding the act of sexual abuse were consistent and there was enough corroboration to support the charge against C.L.

C.D., who was eleven years old at trial, was questioned in chambers in the trial court's library. C.D. testified everything he said during his Gingerbread House interview was true. C.D. testified he was not knocked unconscious, but he had "blacked out," and D.S. was there and witnessed the incident. C.D. further testified he talked about the incident with his dad, his brother, his sister, and his mom and did not tell them a different story than told at the Gingerbread House.

4

C.D. testified in early 2020, he was playing an online video game and one of the other players was talking about something similar which happened to him. C.D. testified he told his sister later that night because he had flashbacks. His sister subsequently called their brother and C.D. told him what happened. C.D. testified he did not tell or suggest to D.S. what he should say at the Gingerbread House and he did not know that D.S. went to the Gingerbread House. C.D. testified he never told D.S. to make up any stories or say anything untrue.

C.D.'s older sister, whose initials are also C.D., was seventeen at the time of trial. She testified around January 2020, C.D. told her C.L. had done something to him. She stated C.D. was uncomfortable talking about it and so she called their older brother, in the hopes C.D. would be more comfortable talking to him instead.

C.D.'s older brother, M.G.D., testified in January 2020, his younger sister called him about something C.D. had told her. M.G.D. stated C.D. said on the day of the incident he was riding a four-wheeler and crashed, became unconscious, and later awoke in a shed with head pains. M.G.D. testified C.D. then said C.L. was behind him and "put his wiener in his booty hole." M.G.D. stated D.S. confirmed what C.D. said.

The state rested and the trial court then advised C.L. of his right to remain silent and his right to testify. C.L. testified he was seventeen years old and would be graduating from high school. C.L. stated he knew C.D. and D.S., and they used to "hang out," but never alone, as D.S.'s older brother was usually with them. C.L. further testified C.D. was never allowed to ride the four-wheelers with them, and as such rode his dirt bike. C.L. denied he ever knocked C.D. unconscious and denied ever doing

5

anything sexually inappropriate with C.D. C.L. testified he was never alone in the shed with C.D. and denied raping C.D.

Following the close of evidence, the trial court found C.L. lied about not being in the shed and D.S. lied about not recalling the incident. The trial court also found C.D. lied or pretended about being unconscious in an effort to cover up the belief he submitted to a sexual attack which he, due to his age, lacked proper consent to do. The trial court also found although D.S. tried to cover for C.L. in his trial testimony, D.S. did confirm at trial his Gingerbread statement was true. The trial court concluded C.L. committed third degree rape, in violation of La. R.S. 14:43, and adjudicated C.L. delinquent for the offense. The trial court ordered a predisposition report and a psychosexual evaluation of C.L., who was remanded to the juvenile detention center pending disposition.

At the disposition hearing in October 2020, the trial court heard testimony from one of C.L.'s teachers and his school's compliance coordinator regarding his course grades and school attendance. John Gianforte testified about the court-mandated psychosexual evaluation of C.L. he conducted. Ben Speer, a juvenile probation officer, testified about C.L.'s performance during his probation regarding a prior adjudication. The trial court also heard testimony from C.D.'s mother and from C.L.'s mother. Following oral arguments, the trial court learned C.L. was on probation for a prior offense when he committed another offense and further failed to comply with a court order requiring him to complete all school assignments. The trial court, in informing the child of the reasons for the disposition, opined C.L. would likely re-offend, and would not be rehabilitated or

6

complete school and court-ordered counseling without the assistance of a group home or transitional living environment with supervision.

Based upon these findings, the trial court committed C.L. to the custody of the OJJ for two years, with all but six months suspended, with credit for time already served at the detention center. The trial court ordered C.L. be placed in a non-secure care or transitional living option in Shreveport so he could continue the sexual treatment program with Mr. Gianforte. The trial court further ordered upon completion of the unsuspended portion of the commitment, C.L. was to: (1) remain under the supervision of the OJJ; (2) complete high school or its equivalency; (3) complete the sexual perpetrator program and the counseling which he began while in OJJ custody; and (4) maintain employment.

Judge Young, who presided over this matter, retired before a judgment of disposition could be signed, as required by La. Ch. C. art. 903. Instead, Judge Stromile, who was serving *pro tempore*, signed a "Custody Order" on November 5, 2020, stating the offense of adjudication and disposition. This appeal of the adjudication followed.

**DISCUSSION**

On appeal, defense counsel contends the evidence presented is insufficient to support the adjudication of third-degree rape. The defense argues the state did not present any reliable evidence of sexual intercourse between C.D. and C.L., because there were inconsistencies between the Gingerbread House statements and the testimony of C.D. and D.S. regarding the details of events surrounding the act.

A reviewing court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

7

have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Leger*, 2017-2084 (La. 6/26/19), 284 So. 3d 609; *State v. Frost*, 53,312 (La. App. 2 Cir. 3/4/20), 293 So. 3d 708, *writ denied*, 2020-00628 (La. 11/18/20), 304 So. 3d 416. The *Jackson* standard is applicable in cases involving both direct and circumstantial evidence. *State v. Frost, supra*; *State v. Butler*, 53,360 (La. App. 2 Cir. 4/22/20), 293 So. 3d 808, *writ denied*, 2020-00798 (La. 11/10/20), 303 So. 3d 1039. The facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156; *State v. Butler, supra*.

The appellate court does not assess the credibility of witnesses or re-weigh evidence, and accords great deference to the trier of fact's decisions to accept or reject witness testimony in whole or in part. *State v. Frost, supra*. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the issue is the weight of the evidence, not its sufficiency. *State v. Jackson, supra*. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State in Interest of C.B.*, 52,245 (La. App. 2 Cir. 6/27/18), 251 So. 3d 562; *State v. Gullette*, 43,032 (La. App. 2 Cir. 2/13/08), 975 So. 2d 753. This principle is equally applicable to victims of sexual assault; such testimony alone is sufficient even when the state offers no medical, scientific or physical evidence to

8

prove the commission of the offense by the defendant. *State ex rel. P.R.R., Jr.*, 45,405 (La. App. 2 Cir. 5/19/10), 36 So. 3d 1138.

The provisions of the Louisiana Children's Code govern and regulate delinquency proceedings, but where procedures are not provided, the court shall proceed in accordance with the Louisiana Code of Criminal Procedure. La. Ch. C. art. 803. All rights guaranteed to criminal defendants by the Constitution of the United States or the Constitution of Louisiana, except the right to jury trial, shall be applicable in juvenile court delinquency proceedings. La. Ch. C. art. 808. The adjudication hearing in delinquency proceedings shall be conducted according to the provisions of the Code of Evidence applicable to criminal cases. La. Ch. C. art. 881. In order for the court to adjudicate a child delinquent, the state must prove beyond a reasonable doubt the child committed a delinquent act alleged in the petition. La. Ch. C. art. 883.

The standard of review in *Jackson v. Virginia, supra*, also applies to juvenile delinquency adjudicatory hearings. *State in Interest of D.R.*, 50,594 (La. App. 2 Cir. 2/24/16), 188 So. 3d 1116. Additionally, in a juvenile case, the reviewing court is constitutionally compelled to review both facts and law. La. Const. art. V, § 10(A) and (B); *State in Interest of C.B., supra*. As in the review of civil cases, a factual finding made by a trial court in a juvenile adjudication may not be disturbed by an appellate court unless the record evidence as a whole does not furnish a basis for the finding, or it is clearly wrong. *State in Interest of W.A.P.*, 52,779 (La. App. 2 Cir. 5/22/19), 274 So. 3d 690. The reviewing court must recognize the juvenile judge observed the conduct and demeanor of the witnesses and was in the best position to determine credibility and weigh the evidence; therefore, this

9

Court grants great deference to the juvenile court's factual findings, credibility determinations, and assessment of the weight of particular testimony. *State in Interest of C.B., supra.* The offense of third degree rape includes a rape which occurs when the anal, oral, or vaginal sexual intercourse is committed by the offender without the lawful consent of the victim. La. R.S. 14:43(A).

In the present case, the record demonstrates the evidence presented by the state was sufficient to support the delinquency adjudication of C.L. for third degree rape. In their videotaped statements at the Gingerbread House, C.D. and D.S. both stated C.L. performed an act of anal intercourse on C.D. At trial, they confirmed their statements were true while C.L. denied committing the act.

After hearing these statements and the trial testimony of C.D. and D.S., the juvenile court accepted their testimony as more credible than C.L.'s denial. The juvenile court acknowledged the inconsistencies regarding C.D.'s statements about being unconscious at some point prior to the incident; however, in assessing C.D.'s credibility, the court ascribed such inconsistency to C.D.'s understandable embarrassment in having submitted to the act by the older and physically larger child. Despite this inaccuracy by C.D. and D.S.'s attempt to diminish the event to avoid getting C.L. in trouble, the bulk of statements from C.D. and D.S. were consistent as to the specifics of the improper act performed by C.L. As the juvenile court correctly noted, C.D. was a young child who was incapable of consenting to any sexual acts.

10

The evidence presented, viewed in a light most favorable to the prosecution, supports C.L.'s adjudication as delinquent for third degree rape. Thus, the assignment of error lacks merit.

*Error Patent*

In reviewing this record for error patent, we note the absence of a written, signed judgment conforming to La. Ch. C. art. 903, which provides in pertinent part:

> B. The court shall enter into the record a written judgment of disposition specifying all of the following:
>
>> (1) The offense for which the child has been adjudicated a delinquent.
>>
>> (2) The nature of the disposition.
>>
>> (3) The agency, institution, or person to whom the child is assigned.
>>
>> (4) The conditions of probation, if applicable.
>>
>> (5) Any other applicable terms and conditions regarding the disposition.
>>
>> (6) The maximum duration of the disposition and, if committed to the custody of the Department of Public Safety and Corrections, the maximum term of the commitment.
>
> . . . .
>
> D. An extract of the minutes of court specifying the information required by Paragraph B of this Article and signed by the court shall be considered a written judgment of disposition.

Although the trial court orally informed C.L. of the reasons for imposing the particular disposition at the disposition hearing, it does not appear this record contains a written "judgment of disposition" as required under La. Ch. C. art. 903(B). *See also* La. Ch. C. arts. 330 and 332. This Court's review shows the record includes: (1) a minute entry and warrant,

11

signed by the deputy clerk of court, announcing C.L.'s commitment to the OJJ and ordering the "Probation Officer of the Parish of Caddo" to carry out the commitment; and (2) an "Office of Juvenile Justice Custody Order," which provides the offense for which C.L. was adjudicated, the disposition and some, but not all, of the conditions of the disposition and the probation.

However, contrary to the requirements of Article 903(B), these documents fail to include the juvenile court's directive which requires upon entering into probation, C.L. must: (1) remain employed, (2) complete counseling, and (3) complete the sexual perpetrator program with Mr. Gianforte. In the cases of *State in Interest of D.R., supra*, and *State ex rel. S.C.J.*, 2009–1272 (La. App. 3 Cir. 2/3/10), 28 So. 3d 1206, *writ denied*, 2010-0496 (La. 4/5/10), 31 So. 3d 363, the courts found the lack of a signed judgment required remand of the matter for entry into the record of a signed judgment of disposition in compliance with Article 903(B).

Thus, this matter shall be remanded with instructions to the Caddo Parish Juvenile Court to enter into the record a written, signed judgment of disposition which complies with the provisions of La. Ch. C. art. 903(B). Since the issue concerning the judgment of disposition is more narrowly tailored to form, and not a change in substance, it is unnecessary to order the trial court to conduct another disposition hearing.

Our error patent review also shows the juvenile court's disposition does not impose several mandatory conditions of probation required under La. Ch. C. art. 897. After adjudication of any felony-grade delinquent act, the court may place the child on probation. La. Ch. C. art. 897(A)(3). As a condition of probation, the court shall impose restrictions prohibiting the child from (1) possessing any drugs or alcohol, (2) engaging in any further

12

delinquent or criminal activity and (3) possessing a firearm or carrying a concealed weapon if the child has been adjudicated for certain offenses, including third degree rape. La. Ch. C. art. 897(B)(1).

The record demonstrates the juvenile court advised C.L. that all but six months of the OJJ custody imposed would be suspended and placed C.L. on supervised probation. Accordingly, on remand of this matter we further instruct the juvenile court to include in the judgment the mandatory conditions of probation stated above pursuant to Article 897(B).

Our review of the record also shows error patent with respect to the juvenile court's post-conviction relief instructions. Since the Children's Code does not specifically address post-conviction relief, the provisions of the Code of Criminal Procedure are applicable. At the time of sentencing, the trial court shall inform defendant of the prescriptive period for post-conviction relief either verbally or in writing. La. C. Cr. P. art. 930.8(C).

We note the juvenile court stated at the disposition hearing C.L. was given notice of his right to appeal and to seek post-conviction relief ("PCR"). However, it is not clear from the record whether C.L. was advised of the proper time delays for filing a PCR application. Consequently, by this opinion C.L. is hereby advised pursuant to La. C. Cr. P. art. 930.8, no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if filed more than two years after the adjudication of delinquency and judgment of disposition have become final under the provisions of La. C. Cr. P. arts. 914 or 922. Furthermore, C.L. will not be deprived of any applicable timelines for post-conviction relief as a result of inaction by the trial court.

## CONCLUSION

For the foregoing reasons, C.L.'s adjudication and disposition are affirmed. Additionally, this matter is remanded to the Caddo Parish Juvenile Court with instructions to enter into the record a written, signed judgment of disposition, including the mandatory restrictions as conditions of probation, in compliance with La. Ch. C. arts. 903(B) and 897. Finally, the applicable timelines for post-conviction relief are to begin once these parameters have been properly articulated in the judgment of disposition.

**ADJUDICATION AND DISPOSITION AFFIRMED; REMANDED WITH INSTRUCTIONS.**

14